In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 19-2104

ROBERT S. FARNIK, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cv-3899 — **Joan H. Lefkow**, *Judge*.

_____

ARGUED FEBRUARY 18, 2021 — DECIDED JUNE 17, 2021

_____

Before BRENNAN, SCUDDER, and KIRSCH, *Circuit Judges*.

KIRSCH, *Circuit Judge*. Robert Farnik was arrested in 2013 for alleged animal cruelty after Chicago Police were contacted about a sickly dog making desperate sounds in Farnik's backyard. Following the arrest, Farnik produced veterinary records for the dog, which he had adopted as a stray and cared for, and his state criminal charge was dismissed. Farnik and

his wife, Andzelika Jastrzebska,[1] then sued the City of Chicago and Chicago Police Officer Marian Horan under 42 U.S.C. § 1983 alleging wrongful arrest and excessive force along with various state law claims. The case eventually proceeded to trial, and the jury returned a verdict for the defendants on all counts. The district court denied Farnik's motion for a mistrial during the trial and later denied a post-trial motion for a new trial. Farnik asks us to reconsider those denials and seeks a new trial because, he asserts, the district court made various legal errors related to the handling of voir dire, trial scheduling, closing arguments, and jury instructions. Because the district court did not err in any of these respects or by denying his mid- and post-trial motions, we affirm.

I

The relevant factual background is drawn from the trial record. Each of Farnik's challenges relate to alleged errors committed by the district court during trial. The below summary focuses on the events relevant to those challenges, providing other facts only as context requires.

A

On May 7, 2013, Monique Moore-Hoffman heard an animal wailing and screeching near a house on the 1500 block of North Hoyne Street in Chicago. Hoffman, a volunteer at Chicago Animal Care, summoned her friend and fellow

---

[1] Jastrzebska asserted a common law loss of consortium claim stemming from the actions taken against Farnik. For clarity, this opinion will distinguish between the two when discussing the factual history of the case but will refer to them collectively as "Farnik" when discussing the legal errors they assert entitle them to a new trial, as the distinction is immaterial in relation to their legal arguments on appeal.

volunteer, Jennifer Jurcak. The women knocked on a window of the home, with no response; eventually, a neighbor allowed them to enter the adjacent yard.

Peering from the neighboring yard, Moore-Hoffman and Jurcak could see a German Shepherd (whose name was later discovered to be Rex) lying on a pallet "screaming." They also saw a second dog, appearing to be in good health, moving freely within the yard. The yard contained piles of feces, smelled of ammonia, and was littered with trash and construction materials, according to witnesses.

Moore-Hoffman and Jurcak called the police and animal control. Chicago Police Officer Marian Horan responded to the call and went to the complained-of house. Horan knocked on the door and rang the bell, with no response. At that point, a crowd had gathered, and Horan overheard someone complaining about the dogs being in the yard constantly, barking day and night. Someone indicated that Robert Farnik owned the house.

Someone from the crowd then broke the gate to Farnik's yard, in the presence of Officer Horan, and the group worked together to remove the dogs. Rex had numerous open sores on his belly, genitalia, and ears, which were covered in flies. Witnesses testified that Rex's legs were stuck in the slats of the pallet and the dog could not move. Videos and pictures were taken at the scene.

Officer Horan filled out a general offense case report, indicating she believed the crime of animal cruelty or animal abuse had occurred.

About two weeks later, on May 24, 2013, Officer Horan was on patrol in the area with another officer, Elio Morales.

Officer Horan saw Farnik parked in an alley behind his house, and she explained the earlier situation to Officer Morales. Officer Horan then approached and arrested Farnik.

During the arrest, Farnik's wife Andzelika Jastrzebska came outside and began yelling at the officers, and a Chicago Police Department supervisor was called to the scene. Farnik claims that, during the arrest, Horan aggressively approached and tightly handcuffed him, causing injuries to his hands. Farnik's doctor testified at trial that Farnik had bilateral carpal tunnel syndrome and that during treatment Farnik said that the symptoms arose because of the handcuffs. The officers disputed that the handcuffs were applied too tightly and testified that Farnik did not complain about the handcuffs until they were about halfway to the station, which was roughly 10-15 minutes from the residence. They testified that it was not safe to adjust the handcuffs while driving and that Farnik did not complain that he could not feel his fingers or hands. There is no dispute that Farnik was cooperative throughout the arrest process.

Once at the station, the handcuffs were loosened and the officers asked Farnik if he wanted to go to the hospital, which he declined. The officers testified that there were no visible signs of injury. Officer Horan called Moore-Hoffman and Jurcak, and they came to the station to sign a criminal complaint against Farnik. Officer Horan then signed the criminal complaint, which alleged animal cruelty.[2]

---

[2] *See* 510 ILL. COMP. STAT. 70/3.01(a), (b) ("(a) No person or owner may beat, cruelly treat, torment, starve, over work or otherwise abuse any animal. (b) No owner may abandon any animal where it may become a public charge or may suffer injury, hunger or exposure.").

On August 6, 2013, the state nolle prossed Farnik's criminal charge after Farnik produced Rex's veterinary records showing that Rex had been to the vet only days before he was removed from the yard. Farnik had found Rex as a stray in Miami, where he often worked construction during winter months, and, after failing to find the owner, felt bad abandoning Rex when he came back to Chicago. Jastrzebska described Rex as a "senior citizen" dog with hip dysplasia issues impacting his ability to walk. Rex also had skin rash problems, and the couple took him "in and out" of the vet's office with no luck in improving his condition despite trying different treatments.

On May 27, 2014, Farnik and Jastrzebska filed an eleven-count complaint against Officer Horan and the City of Chicago alleging claims related to Farnik's arrest. Farnik alleged excessive force and false arrest under Section 1983 against Officer Horan and the City (counts I and VII). Farnik also alleged the following state-law claims: assault and battery (count II), false imprisonment (count VIII) and malicious prosecution (count IX) against Officer Horan; indemnity (count III), respondeat superior (count IV), negligent hiring/retention (count V), and negligent supervision/training (count VI) against the City; and "willful and wanton" misconduct against both defendants (count X). Jastrzebska alleged loss of consortium (count XI).

The district court dismissed with prejudice the negligent hiring/retention claim (count V) and the negligent supervision/training claim (count VI). The district court granted summary judgment for the City on the excessive force claim (count I) and the false arrest claim (count VII), as Farnik conceded that he would not attempt to prove a *Monell* theory. *See*

*Monell v. Department of Social Services*, 436 U.S. 658 (1978). At
trial, Farnik dropped counts II, VIII, and IX and did not pro-
pose a jury instruction on count X.

As a result, the issues left for the jury were Farnik's federal
claims of excessive force and false arrest (counts I and VII)
against Officer Horan (not the City), along with the attendant
indemnification claim under Illinois law (count III), and Ja-
strzebska's claim of loss of consortium against both defend-
ants (count XI).[3]

B

Farnik's appeal focuses on alleged errors made by the dis-
trict court concerning four aspects of the trial. We discuss each
in turn.

*Voir dire.* During voir dire, the district judge questioned
members of the venire about their responses to a written jury
questionnaire. One potential juror stated that Farnik looked
familiar but was unsure if he was the person she had in mind.
The juror then said that in fact both Farnik and Jastrzebska
may have been involved in an "incident" at her workplace. In
the presence of other potential jurors, the district judge asked
whether, if these were the individuals she was thinking of, she
had a positive or negative experience with them. The poten-
tial juror answered, "Well, if it turned out that it were the per-
son that I'm thinking of, it was a negative experience. So I just
thought I'd let you know that."

---

[3] The parties do not address the fate of the respondeat superior claim
(count IV). It appears from the record that this claim was never pressed
below, and it was not made an issue on appeal. As such, any potential
argument on this point has been waived.

The district judge further questioned that potential juror outside the presence of the other potential jurors. The potential juror stated that she had not discussed with others on the venire the specifics of the negative experience she thought she may have had with the plaintiffs. She then stated that she was referring to an instance where someone (possibly Farnik, traveling with Jastrzebska) had been a "jerk" to her when there was an issue with a booked vacation at O'Hare International Airport, where she worked. The potential juror was later excused.

Upon being excused and while exiting the courtroom in the presence of other potential jurors, the exiting juror looked at Officer Horan and said, "good luck." This statement is not reflected in the transcript, but Farnik's counsel later informed the district judge that another attorney had heard her make the statement. Farnik on appeal also alleges that she gave a thumbs up to Officer Horan as she left, which was not mentioned during the trial. Farnik's attorney moved for a mistrial following the potential juror's departure, which was denied.

*Denial of a Continuance.* The next day, Farnik was scheduled to testify. On that morning, he had learned of the death of his longtime friend and arrived one minute late for his testimony. Farnik's attorney asked the district court for an hour break to allow Farnik to compose himself. Farnik's attorney indicated that she believed Farnik could testify that day and earlier had stated that Farnik intended to call a medical witness that afternoon. The district court stated that it would order a 30-minute recess, to which Farnik's attorney said, "We'll take it. Thank you."

Following the recess, Farnik's attorney asked the district court for permission to elicit testimony about why Farnik had

arrived to court late and upset. Defendants objected, arguing it was irrelevant and designed to create improper sympathy for Farnik. The district judge ultimately denied Farnik's request to elicit that testimony. Nevertheless, the first questions Farnik's attorney asked him were as follows:

> Q. How are you feeling this morning, Mr. Farnik?
>
> A. I'm not feeling good.
>
> Q. All right.
>
> A. I lost my best friend.
>
> MR. MARX [Defense Counsel]: Objection.
>
> THE COURT: Sustained
>
> Q. Is that why you were late for court?
>
> A. Yes, sir.

R. 195 at 229:19-230:2. The direct examination then proceeded.

*Closing Arguments*. During closing arguments, Farnik's attorney concluded by asking the jury to "come back with a compensation [sic] and punitive and compensatory damages of $975,000."

Shortly thereafter, defense counsel made the following statement at the beginning of her closing argument:

> MS. GRIFF: After making outrageous claim after outrageous claim, they want you to give them money, specifically $975,000. And they want money from Officer Horan personally. They want you to—
>
> MR. HABIB: Objection, Your Honor.

THE COURT: Overruled.

MS. GRIFF: They want you to take money out of her pocket—

MR. HABIB: Objection again, Your Honor.

THE COURT: Overruled.

R. 197 at 668. Later, defense counsel argued:

> It's important that when I talk to you about damages, what we're talking about is money. We're talking about that $975,000 that the plaintiffs have asked you to give them. You will see an instruction on punitive damages. What does that mean? That means that plaintiff wants you to award them money from Officer Horan personally. Money out of her pocket. They want you to punish her by making her pay them.

R. 197 at 684.

Farnik's counsel renewed the objection to this line of argument, asserting that it misled the jury into believing Officer Horan would be personally liable for paying compensatory damages. The district court allowed Farnik's attorney to clarify this point in rebuttal, which Farnik's attorney did:

> [A]s far as the compensatory damages at this point, she's indemnified by the City of Chicago. So when we're asking for damages at this point, it's not coming out of her pocket, at least in terms of compensatory, it's coming from the City.
>
> But we also ask for punitive damages, because, frankly, at this point, we don't want a situation

> where, in effect, Officer Horan can do what she did and just say, I don't have to worry about it, the City is going to pay my damages so I can walk away from this whole thing. Because punitive damages, as counsel pointed out, are paid directly by Officer Horan out of her pocket.

R. 197 at 731.

*Jury Instructions.* Following closing arguments, the district court read the jury instructions in open court. In the midst of reading one instruction related to probable cause for charged offenses, the district court paused to inquire about whether Farnik had originally been charged with multiple crimes, which led to a clarification that he had in fact only been charged with one crime. Specifically, the following exchange took place:

> THE COURT: Probable cause requires more than just a suspicion, but it does not need to be based on evidence that would be sufficient to support a conviction, or even a showing that defendant's belief was probably right.
>
> The fact that criminal charges against plaintiff were dismissed, does not by itself mean that there was no probable cause at the time of the arrest.
>
> It is not necessary that defendant have probable cause to arrest plaintiff for animal cruelty, so long as the defendant had probable cause to arrest him for some criminal offense.
>
> It is not necessary that defendant have probable cause to arrest plaintiff for all of the crimes he

> was charged with — I think that may be irrele-
> vant in this case, correct?
>
> MR. HABIB: Yes.
>
> THE COURT: Was she [sic] charged with more
> than one crime?
>
> MR. HABIB: No.
>
> MS. GRIFF: No, Your Honor. Based on the in-
> structions and the conference we had this morn-
> ing, that was the edited portion.
>
> THE COURT: Right. I'll read it, but I think there
> was only one: It's not necessary the defendant
> had probable cause to arrest plaintiff for all of
> the crimes he was charged with, so long as she
> had probable cause to arrest him for one of
> those crimes.

R. 197 at 742–43. The court then read the jury the elements of the crime of animal cruelty. The district court also gave a jury instruction relating to the elements of an offense under Illinois's "Humane Care for Animals Act."[4]

On April 5, 2019, the jury delivered a verdict fully in favor of Horan and the City. Farnik moved for a new trial, which the district court denied, and plaintiffs appealed.

---

[4] Stating, in relevant part, that "[e]ach owner shall provide for each of his or her animals: (1) a sufficient quantity of good quality, wholesome food and water; (2) adequate shelter and protection from the weather; (3) veterinary care when needed to prevent suffering; and (4) humane care and treatment." 510 ILCS 70/3(a).

II

On appeal, Farnik argues that the cumulative effect of four legal errors cast him in a poor light and resulted in the adverse verdict against him, entitling him to a new trial. Farnik's arguments, however, fall short of identifying any error in the district court's handling of the trial. And the cumulative effect of various non-errors does not, and cannot, amount to error warranting a new trial.

A

Farnik first argues that the district court erred by denying his motion for a mistrial following voir dire. Farnik asserts the venire became tainted against him when one prospective juror said that she may have had a negative experience with Farnik and Jastrzebska, both of whom looked "familiar" to her. Farnik also argues that the district court erred by not conducting additional questioning of the other prospective jurors following the excused potential juror's comments and departure, during which she allegedly said "good luck" to Officer Horan and gave her a thumbs up.

This court reviews a district court's order denying a mistrial for abuse of discretion, focusing on whether the district court "commit[ted] an error of law or ma[de] a clearly erroneous finding of fact." *Christmas v. City of Chicago*, 682 F.3d 632, 638 (7th Cir. 2012). When conducting this analysis, "we must ultimately determine whether the plaintiffs were deprived of a fair trial." *Id.* And our review is highly deferential—"the trial judge is in the best position to determine the seriousness of the incident in question, particularly as it relates to what has transpired in the course of the trial." *United States v. Danford*, 435 F.3d 682, 686 (7th Cir.

2006) (internal quotation marks omitted). Moreover, jury selection "is particularly within the province of the trial judge." *Skilling v. United States*, 561 U.S. 358, 386 (2010). "No hard-and-fast formula dictates the necessary depth or breadth of *voir dire*." *Id.*

Farnik's arguments do not persuade. First, the excused potential juror's statements about whether she actually recognized the plaintiffs were equivocal, tempering any potential impact on the other members of the venire. Moreover, the district court questioned the excused potential juror further outside the presence of the other potential jurors, during which she stated that she had not discussed the specifics of the (possible) negative interaction with any other members of the venire.

The district court was entitled to make credibility determinations about the excused juror's statements, and it was in a better position than this court to determine and address the seriousness of the incident. *See Danford*, 435 F.3d at 686. The same conclusion holds true with respect to the excused juror's departing "good luck" comment and thumbs up motion, which, at least as to the comment (because the hand sign was first raised on appeal and is thus waived) the district court considered and reasonably rejected. We cannot say that the district court abused its discretion by denying the motion for a mistrial based on its response to the potential juror's de minimis conduct.

Moreover, the cases cited in Farnik's briefing are either far cries from the situation here or undermine his position. For example, Farnik relies on cases discussing juror exposure to pervasive media coverage, *United States v. Tsarnaev*, 968 F.3d 24, 58 (1st Cir. 2020), *cert. granted*, 141 S. Ct. 1683 (Mar. 22,

2021) (No. 20-443),, improper juror consideration (during de-
liberations) of a news article containing prejudicial facts not
in evidence from the trial, *United States v. Thomas*, 463 F.2d
1061, 1063-64 (7th Cir. 1972), and cases involving circum-
stances irrelevant to this case, *McDonough Power Equip., Inc. v.
Greenwood*, 464 U.S. 548, 554–55 (1984); *Smith v. Phillips*, 455 U.
S. 209, 217 (1982). These and the other cases cited by Farnik do
not support his contentions.

Thus, the district court here properly dispatched its voir
dire duties by probing whether the excused potential juror
had made any additional statements which could have preju-
diced Farnik and by considering and rejecting the argument
that brief departing comments in this instance required the
empanelment of a new venire. Satisfied that the other jurors
would follow the court's instructions to consider the case on
its merits, the district court properly denied the motion for a
mistrial predicated on these equivocal and innocuous state-
ments and actions.

B

Second, Farnik argues that the district court erred when it
did not grant a continuance upon Farnik learning of the death
of his friend shortly before he was scheduled to testify. Farnik
relatedly argues that the district court should have allowed
evidence of why he was upset and why he was one minute
late to court. Farnik again asks for a new trial based on these
purported errors. This court reviews the denial of a continu-
ance for abuse of discretion and will reverse only upon a
showing of "actual prejudice." *United States v. Price*, 520 F.3d
753, 760 (7th Cir. 2008).

Farnik's trial counsel asked for an hour recess for Farnik to compose himself, and the district court allowed a 30-minute recess. Trial counsel had stated that she intended to call her expert witness at 2 p.m. that same day, with Farnik's testimony originally slated to begin at 10:30 a.m. In light of the representations made by Farnik's counsel, it is unclear what requirement he is asking this court to impose on district judges as they manage the logistics of a trial. To the extent Farnik is arguing that he should have received an hour break as requested, the court's decision to limit the break to 30 minutes was an appropriate exercise of discretion.

Relatedly, Farnik's argument concerning the district court's decision to disallow testimony about the death of Farnik's friend falls flat. Not only did the district court not abuse its discretion in ruling that Farnik could not broach this topic, Farnik and his counsel blatantly disregarded the district court's order by asking questions and offering answers *about that evidence*. *See Houlihan v. City of Chicago*, 871 F.3d 540, 552 (7th Cir. 2017) (evidentiary rulings reviewed under the abuse of discretion standard). Incredibly, Farnik now draws this court's attention to the entire interaction. We question the efficacy of such advocacy on appeal. In any event, the district court properly exercised its discretion by limiting Farnik's testimony to issues relevant to the substantive issues in the case being tried, which in no way related to the death of Farnik's friend. Accordingly, we find no error in the district court's decisions on this evidentiary matter.

## C

Third, Farnik asserts that the district court erred by allowing the defendants to argue that the entire requested $975,000 damages award would come from Officer Horan personally.

As an initial matter, the argument Farnik ascribes to defendants is not the one defendants made. Instead, defendants argued only that a punitive damages award would be paid by Officer Horan, and defense counsel drew a distinction between the source of compensatory and punitive damages. It is accurate, therefore, to say that Farnik "want[ed] money from Officer Horan personally[,]" R. 197 at 668—the request for punitive damages was in fact a request for the jury to hold Officer Horan liable personally. It is no less accurate for counsel to say: "[t]ell them that you're not going to punish Officer Horan by awarding punitive damages out of her pocket." R. 197 at 684. The statement builds from the legally accurate premise that punitive damages would be awarded from Officer Horan, and defense counsel was arguing to the jury that it was unjustified to award such damages.

In any event, to the extent that these statements created confusion because of the temporal proximity between the accurate statements of the law and the references to the full amount requested, the district court allowed Farnik's counsel on rebuttal to explain the issue. Farnik's counsel did just that, and ably explained that compensatory damages would be paid by the City, and punitive damages would be paid specifically by Officer Horan. This cleared up any confusion that may have arisen from defense counsel's technically accurate statements.

In short, no error occurred. The district judge even allowed Farnik's counsel to remedy any potential confusion, which may be more than was needed in this circumstance.

D

Fourth, Farnik argues that the district court's handling of jury instructions was confusing in multiple respects and constituted an abuse of discretion requiring remand. To begin, Farnik argues that an instruction should have been given related to the source of punitive damages. Next, Farnik argues the district court should not have included an instruction related to "multiple [charged] offenses." Lastly, Farnik argues the district court should not have read the jury the elements of the Illinois crime of animal neglect, which is distinct from the charged offense of animal cruelty. This court reviews the district court's decision whether to give a particular jury instruction for abuse of discretion, and will reverse only if the instructions in their entirety "so thoroughly misled the jury" that they caused prejudice. *Clarett v. Roberts*, 657 F.3d 664, 672 (7th Cir. 2011). No such abuse occurred here.

First, as to the punitive damages issue, Farnik argues that because defense counsel referred to Officer Horan's potential financial obligation to pay punitive damages, the district court should have given an instruction about the source of punitive and compensatory damages. Farnik bases this argument on a motion in limine which the court granted without prejudice to revisit. That motion in limine in effect stated that the court would provide appropriate limiting and jury instructions if defendants referred to "Officer Horan's financial circumstances." Based on our reading of defense counsel's statements, it is not clear that this motion in limine was triggered, as Officer Horan's financial circumstances are only related tangentially to the statements made. Defense counsel did not state that Officer Horan would be bankrupted by punitive damages, he simply stated that Horan would be liable for punitive damages without reference to her ability to pay.

Even assuming that a limiting instruction should have been given, Farnik cannot show that he was prejudiced by the statements made. Farnik's counsel gave a lengthy and accurate explanation that Officer Horan's personal liability was limited to punitive damages, and it is difficult to see how the jury was "thoroughly misled."

Next, although the district court did read the "multiple offenses" instruction (which was not specifically applicable to the facts of this case) the district court clarified with Farnik's attorney—while reading the instruction—that Farnik had only been charged with one crime. The evidence at trial also established both that Farnik had only been charged with one offense and that the charge was later dropped. Given this context, we cannot say that the district court erred in its reading of this instruction.

Finally, turning to Farnik's compound error argument, it too fails. The legal relevance of the instruction on the elements of animal neglect stems from Farnik's unlawful arrest claim. Because "[p]robable cause is an absolute bar to a claim of false arrest asserted under the Fourth Amendment and section 1983," *Muhammad v. Pearson*, 900 F.3d 898, 907 (7th Cir. 2018) (citation omitted), the animal neglect elements were provided as an alternative crime for which Officer Horan could have had probable cause to initiate the arrest. Farnik argues that the defendants sought the inclusion of the animal neglect elements because the jury could not have found probable cause based on the animal cruelty elements, which require worse treatment than simple neglect. But this argument misses the mark. The question for the jury was whether Officer Horan had probable cause for "an" offense, not probable cause for the specific offense that was ultimately charged (and

dismissed). *Id.* at 908 ("An arrest is constitutional if it is made with probable cause for an offense, even if the arresting officer's stated or subjective reason for the arrest was for a different offense."). The district court thus did not err by including the animal neglect instruction.

Although this case stems from a series of unfortunate circumstances for Farnik, whose dog was eventually euthanized, the jury heard and considered the facts at issue and concluded that the defendants were not liable for the asserted claims. The alleged legal errors in this case were in fact not errors, and so the jury's verdict must stand.

                                                 AFFIRMED