In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-2424

DONALD D. GADDIS,

*Plaintiff-Appellant*,

*v.*

BRYAN J. DEMATTEI, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 18-CV-01729 — **Staci M. Yandle**, *Judge.*

ARGUED SEPTEMBER 23, 2021 — DECIDED APRIL 1, 2022

Before KANNE, ROVNER, and WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* Good fences may make good neighbors, but apparently in this case, a tree had no such beneficial effect. Donald Gaddis was arrested for disorderly conduct in Marion, Illinois, following an altercation with his neighbors over some tree branches. Afterward he filed this civil rights suit under 42 U.S.C. § 1983. He asserted false arrest

claims against the neighbors, a visiting guest, and the arresting officers involved (Counts I and II). He also brought a *Monell* claim against the City of Marion and requested injunctive relief against Dawn Tondini, the former Chief of Police for the City of Marion (Counts III and IV). *See Monell v. Dep't Soc. Servs.*, 436 U.S. 658, 690–95 (1978). The district court granted the defendants' motions for summary judgment, and Gaddis appeals. For the reasons described below, we affirm.

**I.**

Because we are reviewing a motion for summary judgment, we accept Gaddis's version of what transpired as true, noting discrepancies where relevant. The trouble started on October 20, 2017 with a tree on the property of Gaddis's next door neighbor on North Highland Avenue, Dorothy McCombs. Gaddis cut down a number of limbs and branches from McCombs's tree that were extending into his yard. He then threw the cut branches back into McCombs's yard. McCombs asked Gaddis to pick up the branches from her yard, but he, in his own words "didn't say a word to her," and left the branches in her yard. (Gaddis Dep. at 37.) Charles Winstead, who lived across the street and was aware of the ongoing tree dispute, informed McCombs that the branches were still there.

Upon learning this, Gaddis crossed the street to Winstead's home and knocked on the door. Through the glass door he saw a guest of Winstead's, Cameron Dunford, who Gaddis had never met. In Gaddis's account, he said nothing and turned back around to return home. While Gaddis was still in the street, Winstead appeared, carrying a rake, and asked Gaddis what he wanted. Gaddis told Winstead he needed to mind his

own business and then returned home. McCombs, who had been watching the scene unfold from her side of the road, told Gaddis, Winstead, and Dunford that she had called the police.

Shortly thereafter, three police officers arrived: Bryan DeMattei, Logan Spinka, and William Lannom. Officer Spinka came to Gaddis's front door and spoke with him through the screen door about the situation, at which point Gaddis complained that calling the police had been a cowardly thing to do. Officer Lannom joined them. Gaddis describes talking to the officers for ten to fifteen minutes and telling them, among other things, that "people were acting like girls around this place." (Gaddis Dep. at 53). Meanwhile, Officer DeMattei went across the street to hear Winstead and Dunford's version of what had happened. As this all transpired, a "bunch" of neighbors gathered because, as Gaddis explained, "Dorothy McCombs had stirred them, acting like I'm trying to cut down a little old lady's tree." (Gaddis Dep. at 53). Officer DeMattei then came over to Gaddis's porch and told him through the door that he was being arrested for disorderly conduct. Gaddis initially refused to come out of his home, but stepped out onto the porch after Officer Lannom told him he would also be charged with resisting arrest if he failed to come outside. Gaddis complied and was arrested for disorderly conduct.

In Dunford's telling of the event, Gaddis did more than appear on the porch and knock on the door. Instead he told Winstead to "come out you coward" after "pounding and pounding" on his door. He then repeatedly called Winstead and Dunford "little girls," and said "you want to go old man?" to Winstead. (Dunford Dep. at 16–21).

As Winstead recalls it, Gaddis knocked on his door and said, "this was none of your business." When Winstead walked outside carrying the rake, Gaddis goaded him by repeatedly saying, "come on, come on," but eventually went back to his own house when Winstead turned away. McCombs said the whole thing started when Gaddis cut her tree limbs "in the dead of night" and she woke up the next morning and photographed the limbs in her yard. (McCombs Dep. 8). She further testified that on the day of his arrest, Gaddis was "erratic and threatening and screaming" and pounding on Winstead's door because he "wanted to fight." She called the police on the basis of her belief that Gaddis was "out of control." (McCombs Dep. 19–20).

The responding officers have a fairly limited recollection of what transpired. Officer DeMattei recalls speaking to Dunford when he arrived and deciding to arrest Gaddis for disorderly conduct based on what he heard about Gaddis coming to Winstead's porch. Although Officer Spinka and Officer Lannom remember very little about the incident, it is undisputed that they were on Gaddis's porch to make sure he stayed nearby during the investigation and ensure that he was not threatening or dangerous.

In 2018, Gaddis brought this § 1983 action against Officers DeMattei, Spinka, and Lannom, the city of Marion, Illinois, and McCombs, Dunford, and Winstead. He asserted claims for false arrest in violation of the Fourth Amendment, claimed the city was liable under *Monell* for failure to properly train its officers, and sought injunctive relief against former Marion police chief Dawn Tondini. He also advanced state-law false arrest claims against McCombs, Dunford, and Winstead.

Ultimately the district court denied Gaddis's motion for summary judgment as to liability, and granted summary judgment in favor of the remaining defendants except Winstead, who the district court allowed Gaddis to dismiss without prejudice. The district court held that because Officer DeMattei had probable cause to arrest Gaddis, his false arrest claims failed against the officers as a matter of law. The court also rejected Gaddis's claim that he was unlawfully "seized" while the officers stood on his porch and spoke with him. With no underlying viable constitutional claim, Gaddis's *Monell* claim likewise failed. Next the district court entered summary judgment for McCombs and Dunford after concluding there was no evidence either of them encouraged or procured Gaddis's arrest as required to support a false imprisonment claim under Illinois law. Finally, the district court granted Gaddis's unopposed motion under Federal Rule of Civil Procedure 41(a) to dismiss Winstead without prejudice. Gaddis appeals only the district court's grant of summary judgment to McCombs, Dunford, and Officers DeMattei, Spinka, and Lannom.

## II.

Before addressing the merits, we must confront the jurisdictional dilemma posed by the district court's dismissal of Winstead without prejudice. As the district court itself recognized, the plain language of Rule 41(a) envisions the dismissal of an entire "action," not a particular claim against a particular party as occurred here. *See* Fed. R. Civ. P. 41(a)(2). The district court nevertheless concluded dismissal of the claim against Winstead was appropriate under Rule 41(a)(2), which authorizes granting a party's motion to dismiss "on terms that the

court considers proper." Ordinarily such a dismissal without prejudice does not constitute an appealable final judgment because the plaintiff could re-file the case against the dismissed party. *Larkin v. Galloway*, 266 F.3d 718, 721 (7th Cir. 2001).

In response to our request for briefing on this issue, Gaddis essentially argues that Winstead's dismissal is de facto a dismissal with prejudice, or should at least be treated as one on appeal. His logic is as follows: given that he asserted only a state-law claim of false imprisonment against Winstead, Gaddis maintains that there is no longer a basis for the district court's federal jurisdiction and he thus "can never re-file that claim in District Court." Gaddis's assertion that the district court would lack jurisdiction over his claim against Winstead is odd given that he fails to contemplate the possibility that he would prevail against the other defendants on appeal and could again attempt to join Winstead to the suit on remand. We need not, however, consider the merits before deciding whether we have jurisdiction.

Taken together, Gaddis's arguments amount to a request that we treat the dismissal as one with prejudice. We have long recognized that a plaintiff may on appeal convert a dismissal without prejudice to a dismissal with prejudice to resolve the finality problem posed by a dismissal without prejudice. *See JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 776–77 (7th Cir. 1999). Although it may be implicitly, that is precisely what Gaddis has done here. Specifically, Gaddis provides the following arguments for finality in his brief: "Because Gaddis believes that Winstead testified honestly, Gaddis moved to dismiss him from this case. He seeks no relief against Winstead in this appeal." (Appellant's Br. at 29.) He further insists that

his case against Winstead "is over insofar as the United States District Court for the Southern District of Illinois is concerned." (Appellant's Br. at 8). He reiterates that point yet again with his insistence that the dismissal without prejudice "is final because Gaddis is now foreclosed from bringing any claims against Mr. Winstead in the District Court." (*Id.* at 9).[1] These and other statements in Gaddis's brief amount to an expression of his willingness to convert the dismissal without prejudice to one with prejudice to ensure our jurisdiction on appeal.

Turning then to the merits, we review the district court's entry of summary judgment de novo, drawing all reasonable factual inferences in Gaddis's favor. *E.g.*, *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021). To prevail on his Fourth Amendment claims for false arrest, Gaddis must show that he was arrested without probable cause. *See Farnik v. City of Chi.*, 1 F.4th 535, 545 (7th Cir. 2021). Probable cause for an arrest provides an absolute defense to a false arrest claim. *Id.* Probable cause exists when a reasonable officer could have believed a crime had been or was being committed. *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). The officer's belief

---

[1] The only statement that could plausibly be interpreted to suggest Gaddis in fact wants to retain the dismissal without prejudice is his assertion in his brief that "[H]is motion makes clear that he does not believe he has any claim against Winstead but wants the dismissal to be without prejudice *as a precautionary measure*." (Emphasis added.) We decline to let Winstead have it both ways, particularly when he has provided no authority for such an approach. *See, e.g.*, *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("[T]his court has repeatedly and consistently held that perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived.").

need not be "'correct or even more likely true than false, so long as it is reasonable.'" *Fleming v. Livingston Cnty.*, 674 F.3d 874, 879 (7th Cir. 2012) (quoting *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999)). Disorderly conduct under Illinois law is described as an individual doing "any act in such unreasonable manner as to alarm or disturb another and provoke a breach of the peace." 720 ILCS 5/26-1(a)(1).

Although Officer DeMattei himself conceded he did not have a detailed memory of the events, his uncontested report from that day provides ample information from which he could have reasonably believed probable cause existed to arrest Gaddis for disorderly conduct as defined above. Officer DeMattei documented (1) hearing from McCombs that Gaddis had been causing a disturbance; (2) hearing from Dunford that Gaddis had been calling him a coward and attempting to start a fight; (3) hearing from Winstead that Gaddis's disruptive behavior was an "ongoing issue" that had recently been becoming "more aggressive;" and (4) his own assessment that Gaddis may pose a risk to others. These facts, taken together and gleaned firsthand by DeMattei, made it reasonable for him to believe Gaddis's behavior alarmed or disturbed others as described in the Illinois disorderly conduct statute. *Cf. McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012) ("Arguable probable cause exists when a reasonable officer could *mistakenly* have believed they had probable cause to arrest.") (Emphasis in original.). Gaddis's Fourth Amendment claims based on false arrest thus fail as a matter of law. *See Muhammad v. Pearson*, 900 F.3d 898, 907–08 (7th Cir. 2018). Gaddis next advances several Fourth Amendment claims based on the timing and location of his arrest. First, he claims his arrest

violated the well-established rule that the Fourth Amendment prevents officers from making a warrantless and nonconsensual entry into a suspect's home to make a routine arrest. *E.g.*, *Payton v. New York*, 445 U.S. 573, 590 (1980). Because it is undisputed that he opened his front door and walked out onto the porch before he was officially placed under arrest, he cannot establish a literal violation of *Payton*. Presumably recognizing this problem given the undisputed facts, Gaddis suggests he was in fact under arrest when Officers Lannom and Spinka were first on his porch speaking to him. In support of this claim, Gaddis cites a number of cases considering when a seizure occurs for Fourth Amendment purposes, relying in particular on a line of cases establishing that an individual may be seized without being physically restrained when, given the totality of the circumstances, "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Gaddis argues these cases apply here given the officers' deposition testimony agreeing that they were on Gaddis's porch at least in part to make sure "that Gaddis stayed in the vicinity." (Lannom Dep. at 12); (Spinka Dep. at 10). This leads Gaddis to the conclusion that he was already under arrest while inside his home speaking to Officers Lannom and Spinka through the open screen door.

The mere fact that in addition to gathering information, Officers Lannom and Spinka wanted to ensure Gaddis stayed nearby does not transform his entirely consensual interaction with them into a seizure. It has long been established that the Fourth Amendment is not implicated when officers approach a doorway, knock, wait for an answer, and engage in conversation until asked to leave. *See e.g.*, *Florida v. Jardines*, 569 U.S. 1,

8 (2013). Here Officers Lannom and Spinka did exactly that. Gaddis never asked them to leave and presented no evidence that he was not free to close the door on them and go about his business. Their admission that part of their aim in being on the porch was to prevent Gaddis from leaving the scene does not transform the consensual interaction into a seizure implicating the Fourth Amendment.

Gaddis's final theory is that officers violated the Fourth Amendment by coercing him outside to arrest him when they undisputedly lacked authority to enter his home in order to effectuate his arrest. Gaddis testified that Officer DeMattei arrived on his porch and told him to step outside because he was being arrested for disorderly conduct. He also said that Officer Lannom claimed that if Gaddis did not come out he would be arrested for resisting arrest. After Gaddis "thought about it for a while," he decided to go outside, where he was arrested. According to Gaddis, the threat of additional charges amounted to coercion that left him with no choice but to step outside his home. For their part, the officers maintain there was no coercion and that they are in any event entitled to qualified immunity as to the facts surrounding Gaddis's arrest.

Gaddis must make two showings to overcome the officers' assertion of qualified immunity. First, he must demonstrate that the facts, when viewed in the light most favorable to him, establish a violation of his constitutional rights. *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2017). He must also show that their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Because the second inquiry is often conclusive, we may start our

analysis there. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The showing of clearly established law must be specific to the particular facts of the case. In other words, Gaddis may not rest on generalities about when coercion may lead to a Fourth Amendment violation, but must rather point to cases establishing a rule that makes it obvious that raising the possibility of further charges if Gaddis declined to come out would amount to unlawful coercion. *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.") (internal quotations and citation omitted); *see also Ashcroft v. Al-Kidd*, 563 U.S. 731, 742 (2011) ("We have repeatedly told courts … not to define clearly established law at a high level of generality."). In other words, the inquiry whether the conduct clearly violates established law "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). This precision is particularly important in the context of the Fourth Amendment, where the Court has recognized that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine … will apply to the factual situation the officer confronts." *Saucier*, 533 U.S. at 205.

Gaddis's argument boils down to a claim that officers violated—if not the letter, at least the spirit—of the *Payton* rule by raising the possibility of further charges if he exercised his undisputed right to stay inside his home and demand that officers procure a warrant for his arrest. There are cases recognizing the possibility that officers may violate *Payton* by engaging in behavior to coerce an occupant out of his home.

Those cases observe that coercive actions by officers accomplish "'the same thing' and achieve the same effect as an actual entry, and therefore trigger *Payton*'s protections." *See United States v. Allen*, 813 F.3d 76, 78 (2d Cir. 2016) (quoting *United States v. Morgan*, 743 F.2d 1158, 1166 (6th Cir. 1984)). Critically though, that same line of case law notes that circuits are split between a narrow reading of *Payton* requiring actual entry into the home for a violation and those recognizing the kind of "legal fiction of constructive or coercive entry" described above. *Allen*, 813 F.3d at 81. Notably, our circuit has to date limited *Payton* to its literal holding that non-exigent warrantless arrests *inside the home* violate the Fourth Amendment. *United States v. Berkowitz*, 927 F.2d 1376, 1385 (7th Cir. 1991) (relying on *Payton* for the rule that the Fourth Amendment "draws a firm line at the entrance to the house") (internal quotation and citation omitted). Given this , it is axiomatic that there is no "clearly established law" in our circuit establishing what officers may permissibly do to encourage an occupant to come outside within the limits of the robust Fourth Amendment protections forbidding warrantless routine arrests inside the home as recognized by *Payton* and its progeny. *See Wilson v. Layne*, 526 U.S. 603, 617–18 (1999) (affirming that government officials were entitled to qualified immunity where no "controlling authority in their jurisdiction" clearly established the rule on which the petitioners sought to rely); *Upton v. Thompson*, 930 F.2d 1209, 1217 (7th Cir.1991) (circuit split indicated the rights at issue were "currently unsettled as a matter of constitutional law and therefore were not 'clearly established' ").

Because Gaddis cannot identify the required clearly established law, we need not inquire whether the officers here violated the constitution. (Although we note that our failure to reach the issue should in no way be read as sanctioning the use of threats or deception to "encourage" a suspect to step out of his home.) It is enough that at the time of Gaddis's arrest, it was not clearly established that such a statement, followed by an ostensibly consensual choice to exit one's home and face arrest, would violate the Fourth Amendment's prohibition on routine warrantless arrests inside the home.

That leaves Gaddis's state-law claims against McCombs and Dunford. To succeed on his false arrest claim under Illinois law, Gaddis must show 1) arrest or restraint against his will; 2) caused or procured by the defendants; and 3) made without probable cause or reasonable grounds to believe he committed the offense. As discussed above, Gaddis has failed to show that the arresting officers here lacked probable cause. Moreover, private citizens may be liable for false arrest only upon a showing that they commanded or mounted a campaign against the police in order to procure the plaintiff's arrest. *See Butler v. Goldblatt Bros., Inc.*, 589 F.2d 323, 326 (7th Cir. 1978; *Odorizzi v. A.O. Smith Corp.*, 452 F.2d 229 (7th Cir. 1971). Gaddis claims he satisfies this requirement with evidence that both McCombs and Dunford exaggerated his behavior when describing it to police (characterizing him as "out of control" and "pounding" instead of knocking on Winstead's door). But merely providing information to police is insufficient to constitute participating in or procuring an arrest. *Odorizzi*, 452 F.3d at 232 ("[G]iving information to police in itself is insufficient to constitute participation in an arrest."). In any event, even when viewing

the facts in the light most favorable to Gaddis, it is not clear that McCombs or Dunford embellished or falsified facts in their descriptions to police. Gaddis himself admitted in his deposition that it was "possible" his behavior could be perceived as threatening. (Gaddis Dep. at 43) (noting that when he "corrected" Winstead by telling him to mind his own business it is "possible" that "he somehow took that as a threat or something, I guess"). Given the existence of probable cause for his arrest and the lack of evidence suggesting either Dunford or McCombs pressured or persuaded officers to arrest Gaddis, his state-law claims fail as well.

### III.

For the foregoing reasons, we direct the district court to convert Winstead's dismissal without prejudice into one with prejudice, and we AFFIRM the district court's grant of summary judgment to all remaining defendants.